J-A21021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| THOMAS L. HELMICK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| EMMA LLOYD | : | |
| | : | |
| Appellant | : | No. 160 MDA 2025 |

Appeal from the Order Entered January 3, 2025
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-17-09319

BEFORE: PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.*

MEMORANDUM BY LANE, J.: **FILED: OCTOBER 1, 2025**

Emma Lloyd ("Mother") appeals from the order which granted the

petition for modification of custody filed by Thomas L. Helmick ("Father").

Upon careful review, we affirm.

The trial court set forth the relevant factual background of this matter

as follows:

> The parties are the biological parents of one minor child,
> [A.L.] ("Child" . . .), born [in] November . . . 2016. Mother and
> Father met attending the same college and had a brief relationship
> that resulted in the birth of . . . Child. Mother and Father
> ultimately ended their relationship, and both returned to their
> hometowns, Mother in Pennsylvania and Father in Virginia.
>
> Father lives . . . in Salem, Virginia[,] with his parents in a
> four-bedroom home. Father works full-time as a UPS driver. His
> typical work schedule is Monday through Friday from 9:20 a.m.
> until 6:00 or 7:00 p.m. The Child has her own bedroom in Father's
> home. When in Father's custody, she spends significant time with

_____

* Former Justice specially assigned to the Superior Court.

. . . Father, paternal grandparents, and other paternal relatives that live nearby. Paternal grandmother described Father as [a] "girl's daddy" and she testified she is "very proud" of the Father her son has become.

Father described [Child] as having a strong personality. She is very opiniated and loves art and swimming. Father testified extensively about [Child's] home life with [M]other. Specifically, Father testified he has concerns about domestic violence [Child] may have been exposed to in Mother's home, the stability of Mother's living arrangements, and Mother's failure to provide information to Father about the Child's medical issues. He also testified about Mother's criminal charge related to disorderly conduct-engage in fighting in which Mother pled guilty. Father also testified that the Child was present after the incident but while the police were still on the scene. Father said that Mother is evasive about her residence and always changing the location of where the custody exchanges should occur. Additionally, Father presented current school records in which Mother listed the home of maternal grandmother as the Child's residence. Father also presented a letter from the Child's prior school about the number of Child's absences and tardies. Father testified he is better able to provide stability for the Child in a healthy environment.

Mother resides . . . in Nottingham, Pennsylvania[,] in a four-bedroom home on nine acres she shares with her significant other, Taylor Ecenrode [("Ecenrode")], her [three] children, including [Child], and . . . Ecenrode's son. [Child] shares a bedroom with her two-year-old [half-]sister, Stella. Mother is employed at Bridegeport Family Restaurant and works every Tuesday, Friday, Saturday[,] and Sunday from 6:00 a.m. till 3:00 p.m. Mother frequently uses maternal grandmother as her childcare provider. [Mother] often drops . . . Child off at maternal grandmother's home the evening prior to her 6:00 a.m. shift. Maternal grandmother, who lives in a neighboring school district, will transport [Child] to a nearby bus stop for [Child] to get to school. Prior to moving to Green Lane in April 2023, Mother lived for four years in Lititz, and [Child] attended kindergarten in the Warwick School District. Mother testified that [Child] has a strong bond with her [half-]siblings and enjoys playing with them. Mother's current residence has a large amount of land and outdoor activities which [Child] enjoys.

Regarding her criminal charges, Mother testified [that] Child arrived at home after the incident but before the police vacated the residence. Mother also indicated . . . Child remained in grandmother's car until the police left. In response to Father's concerns about domestic violence, Mother denied that there were any significant concerns and testified during cross[-]examination that neither she nor . . . Ecenrode had ever filed protection from abuse [("PFA")] actions against each other. Upon the court's questioning, Mother did acknowledge that she and . . . Ecenrode had filed for and received temporary [PFA] orders against each other. In fact, Mother was granted a temporary [PFA] order by this court following an *ex parte* hearing. Mother acknowledged that the allegations in her PFA petition were true and correct as she originally verified. Specifically, Mother alleges in the petition that . . . Ecenrode got in her face, threw her phone, screamed at her, body checked her, and choked her so hard during a sexual encounter that blood vessels appeared on her face and left marks on her neck. Regarding . . . Ecenrode's petition against Mother, he alleges Mother pushed and punched him several times, Mother had fits of rage, Mother threw paint in anger, Mother tried to smash the back door and break into the home, and Mother threatened suicide. Mother denied that she ever threatened to commit suicide, but did acknowledge that the other incidents are correct. Mother and . . . Ecenrode withdrew their temporary PFAs and their request for final PFA orders. After the incidents, Mother and . . . Ecenrode did not seek counseling but did seek medication from their physicians. Mother was diagnosed with post-partum depression and . . . Ecenrode with anxiety.

Given credible incidents of domestic violence between Mother and . . . Ecenrode, some of which occurred in their home, the court ordered Mother and her partner to undergo domestic violence evaluations. Mother's evaluation was completed by Molly Simmons, M.S., N.C.C., L.P.C., C.S.O.T.S. [("Ms. Simmons")] of Triad Treatment Specialist, Incorporated, [and] was made part of the record and reviewed by this court. The evaluator recommended monitoring by Mother's primary care physician for the reintroduction of medication for Mother's emotional dysregulation, mental health treatment related to stress management, anger management, and emotional regulation for Mother, domestic violence treatment and literature for Mother, couple's counseling for Mother and her partner, and finally, play therapy for the children in the home, including [Child], to have an understanding of available resources to insure their safety and

- 3 -

security should a situation arise while in Mother's home. Mother has not followed any of the evaluator's recommendations. Moreover, to date, the court has not received a domestic violence evaluation for . . . Ecenrode[,] who continues to be a household member of Mother. Based on Mother's testimony, . . . Ecenrode refused to complete an evaluation.

As indicated in Mother's evaluation, it is difficult for Ms. Simmons to determine if the incidents were isolated incidents that arose out of the extenuated circumstances or if Mother was merely trying to minimize the incidents that led to the filing of the protection from abuse matters. The court does note initially Mother testified that she and . . . Ecenrode did not have restraining orders against the other. Only upon the court's questioning did Mother acknowledge the temporary PFAs that were in effect and disrupted the home life for Mother and her children. Mother's testimony further illustrates the evaluator's concerns about Mother's minimization of these incidents, concerns which the court shares and cannot ignore.

Trial Court Opinion, 1/3/25, at unnumbered 3-6 (unnecessary capitalization omitted).

The trial court additionally set forth the procedural history of the case as follows:

Father initiated this case by filing a complaint for custody on October 25, 2017. The parties entered a custody stipulation adopted by the court and entered as custody order dated December 10, 2018, which provided the parties shall share legal custody with Mother having primary physical custody and Father having periods of partial physical custody. On January 3, 2020, Father filed petitions for special relief, contempt, and modification. Mother filed an answer to Father's petitions on January 13, 2020. On September 18, 2020, the parties reached an agreement to keep the December 10, 2018 custody order in effect with modifications to Father's custodial time, the custody exchange location, and the Christmas holiday physical custody schedule.

On September 2, 2022, Father filed a petition for modification, and the matter was resolved by mutual agreement before the custody conference officer and entered as a court order

on December 8, 2022. The order continued shared legal custody, primary physical custody with Mother and partial physical custody with Father. The order expanded Father's physical periods of custody during the summer.

The matter currently before the court is Father's petition for modification and notice of proposed relocation. Father is requesting that the court grant Father primary physical custody and have the Child reside with Father in Virginia, thus changing Mother's custodial contact with the Child. Mother filed a counter-affidavit opposing the Child's relocation to Virginia with Father. After the parties were unable to resolve the matter at a custody conciliation conference, the matter was scheduled for a hearing for September 5, 2024. Upon close of testimony on September 5, 2024, based on the testimony of Mother and her significant other, . . . Ecenrode, the court ordered Mother and her significant other to undergo domestic violence evaluations. This court's interim order dated September 13, 2024[,] mandated a timeline for the court's receipt of the evaluations. Mother participated in the evaluation and her report was received by the deadline. The court, however, did not receive . . . Ecenrode's evaluation by the deadline and a rule to show cause hearing was scheduled for December 11, 2024. The hearing was held on December 11, 2024, to address . . . Ecenrode's failure to undergo the evaluation, as well as review the results of Mother's evaluation and enter the evaluation into evidence.

Trial Court Opinion, 1/3/25, at 1-2 (unnecessary capitalization omitted).

At the December 11, 2024 hearing, Mother testified that Ecenrode "just didn't want to do [the evaluation,]" and she was not able to get him to do so. N.T., 12/11/24, at 4. Mother claimed that "I'm not in a relationship with [Ecenrode] because of him not going to the evaluation." *Id*. at 15. Nevertheless, Mother confirmed that she is still living with Ecenrode at times, stating "my animals are there and I'm still partly residing, still have some of my stuff there . . ." *Id*. at 16; *see also id*. at 5 (wherein Mother stated, "we still do have pets and stuff that reside [at Ecenrode's home]"). Mother

continued, "[r]ight now I'm kind of staying back and forth with my mom and sometimes [at Ecenrode's home] also, but I've been trying to stay with my mom because I wasn't sure how the [c]ourt would see that without him doing the evaluation." *Id*. at 5. Regarding Child, Mother claimed that "she stays at my mom's most of the time" but "[s]ometimes the bus drops her off at [Ecenrode's] and I come to the driveway and I pick her up." *Id*. at 16. Notably, the trial court specifically asked Mother "is your daughter still having contact with [Ecenrode]," and Mother answered, "yes, your honor." *Id*. at 6 (unnecessary capitalization omitted). Although Mother testified that she had arranged for the purchase of a home, of which she would be the sole owner, she later conceded that the sale was merely pending, and she did not own the home. *See id*. at 4, 10.

On January 3, 2025, the trial court entered an order granting Father's petition for modification and awarding him primary physical custody of Child in Virginia. The court directed that Mother would have partial physical custody of Child every other weekend during the school year, and set forth a holiday and vacation schedule for the parties to follow. The court additionally ordered that the parties would continue to share legal custody of Child. The trial court issued an opinion in support of the order in which it discussed the sixteen custody factors set forth in 23 Pa.C.S.A. § 5328(a), as well as the ten relocation factors set forth in 23 Pa.C.S.A. § 5337(h). Mother filed a timely notice of appeal, as well as a concise statement pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).  The trial court thereafter authored an opinion pursuant to Rule 1925(a)(1).

Mother raises the following issue for our review: "Should the lower court's order granting Father's petition to relocate and custody modification order be reversed where its consideration of the relevant factors was based on a key factual finding that was not supported by and contradicted by the evidence in the record?"  Mother's Brief at 3 (unnecessary capitalization omitted).

When reviewing a custody order:

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad.  Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence.  We defer to the trial [court] regarding credibility and the weight of the evidence.  The trial [court]'s deductions or inferences from its factual findings, however, do not bind this Court.  We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

*D.Q. v. K.K.*, 241 A.3d 1112, 1117 (Pa. Super. 2020) (citation omitted).

The Child Custody Act ("Act") requires a trial court to consider all of the section 5328(a) factors when "ordering any form of custody."  23 Pa.C.S.A. § 5328(a). In child custody cases, the "paramount concern" is the child's best interests.  *R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019) (*quoting C.G. v. J.H.*, 193 A.3d 891, 909 (Pa. 2018)).  "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being."  *Id*.

(*quoting* **M.J.N. v. J.K.**, 169 A.3d 108, 112 (Pa. Super. 2017)). The Act directs courts making custody orders to determine the child's best interests by considering "all relevant factors," including the following sixteen enumerated factors:

> **(a) Factors**.--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.
>
> (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Upon any objection to a party's relocation, the trial court must hold a hearing and consider whether relocation is warranted pursuant the ten relocation factors set forth in section 5337(h), which are as follows:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

Although her statement of the question involved is somewhat vague,

Mother's discussion of her issue reveals that she presents a general challenge

to the trial court's consideration of five of the custody factors set forth in section 5328(a), and one of the relocation factors set forth in section 5337(h). Specifically, Mother challenges the trial court's analysis of custody factors (2), (4), (8), (10), and (12), and relocation factor (6) solely on the basis that the trial court's assessment of each of these factors was based primarily on its misperception that Mother still resides with Ecenrode.

Mother submits that "throughout the reasoning in the trial court's order, it consistently assumed that Mother lives with Ecenrode and that the Child regularly interacts with him and is exposed to domestic violence." Mother's Brief at 13 (unnecessary capitalization omitted). Mother maintains that "[t]his core factual finding is simply wrong." *Id*. at 14. Mother points out that, at the hearing on December 11, 2024, Mother explained that she and Child lived with maternal grandmother, and although Mother occasionally had to return to Ecenrode's home to care for pets, Child's "contact" with his residence (not Ecenrode himself) was when Mother met the Child at the end of the driveway on days that the school bus dropped her off at the Ecenrode's house. *See id*. at 14 (*citing* N.T., 12/11/24, at 6, 16). Mother argues that there was no evidence offered at the December 11, 2024 hearing that the Child has any actual contact with Ecenrode. Instead, Mother insists that she testified at the hearing that she had purchased a home in the same school district, where she would be the sole owner, and that closing was imminent. *See id*. (*citing* N.T., 12/11/24, at 4). Mother claims that she further explained to the trial court

that she is not in a relationship with Ecenrode anymore. ***See id***. (*citing* N.T., 12/11/24, at 15). Mother asserts that she dissociated herself with Ecenrode to alleviate the trial court's concerns about the Child's potential exposure to domestic violence and eliminated Ecenrode from the Child's life. Mother argues that the trial court's order fails to acknowledge that Mother and Child no longer have contact with Ecenrode.

In sum, Mother submits that before the subject custody order was entered, she had primary physical custody, and the Child had attended school in Mother's school district since the inception of her education. Mother argues that the trial court's order has disrupted the stability of the Child's life by forcing her to move to Virginia during the school year, and significantly diminished Mother's custodial time to the point where she no longer has any role in the Child's education, which was a responsibility that Mother attended to before the order. Mother insists that the Child could have remained in the same school district while living in her Mother's new home, but instead, Child has been forced to relocate to live in the home owned by her paternal grandparents, and must orient herself to a new school, friends, activities, *etc*. Mother contends that this drastic disruption to the Child's life could have been avoided had the trial court not misconstrued the facts relative to where Mother lived.

The trial court considered Mother's issue and determined that it lacked merit. The court reasoned:

. . . [A]t the time of the September 5, 2024 custody hearing, Mother was in a relationship with . . . Ecenrode and resided with him at his home, along with Mother's children, . . . Ecenrode's son, and a child Mother and . . . Ecenrode share. Additionally, the testimony established that although Mother was not on the deed to . . . Ecenrode's home, she contributed $30,000.00 to the purchase of the home. Following the hearing, the court ordered that Mother and . . . Ecenrode undergo domestic violence evaluations due to the credible testimony about the history of domestic violence between Mother and . . . Ecenrode, and in light of the fact that Mother and . . . Ecenrode previously filed PFAs against each other and testified to the truthfulness of the allegations in their respective PFA petitions. Additionally, Mother has a criminal conviction for disorderly conduct involving an altercation between Mother and her sister with whom Mother and her Children previously resided. [Ms.] Simmons . . . performed a domestic violence evaluation on September 27, 2024 for Mother. . . . Ecenrode never [underwent] an evaluation. On November 25, 2024, the court entered an order scheduling a rule to show cause hearing to address the status of the domestic violence evaluations.

At the December 11, 2024 hearing, Mother testified that . . . Ecenrode chose not to undergo an evaluation. N.T.[,] 12/11/24, at 4:13-18. Mother further testified that she was no longer in a relationship with him. *Id*. at 17:24-25. However, Mother said that she was currently "staying back and forth with my mom and sometimes . . . Ecenrode[,]" and the Child was still having contact with him. *Id*. at 5:3-4, 6:2-4. Mother later testified that the Child was not around . . . Ecenrode except for when the bus drops her off at his home. *Id*. at 16:13-15. [Mother] still has pets and other belongings at . . . Ecenrode's home. *Id*. at 5:7-9. Mother also said she had signed a sales agreement to purchase a home, which she would be the sole owner of, and her closing on the home was scheduled for January 3, 2025. *Id*.

Mother suggests that the court should not have considered . . . Ecenrode as a household member because her testimony established that the Child is no longer exposed to or living with [him]. The court disagrees and finds this assertion is a misstatement of Mother's own testimony. The court specifically asked whether the Child was still having contact with . . . Ecenrode, to which Mother responded ["]yes.["] [*Id*.] at 6:2-4. The court later asked whether the Child was still around . . . Ecenrode, to which Mother responded that the Child stays at

- 13 -

maternal grandmother's home most of the time but sometimes the bus drops her off at . . . Ecenrode's home. In her statement of errors complained of on appeal, Mother acknowledges that she stated that this was the only contact the Child had with . . . Ecenrode but then avers that the Child is no longer exposed to . . . Ecenrode, which directly contradicts Mother's testimony.

The court addressed Mother's lack of credibility in its custody opinion. Most notably, Mother testified that she did not know whether a restraining order or PFA had ever been filed against . . . Ecenrode. Later, upon the court's questioning, Mother did acknowledge she had filed a petition for a PFA, and this court held the *ex parte* hearing in which Mother's request for a temporary PFA was granted. Moreover, Mother acknowledged the allegations in the PFA petition were true and accurate. Mother testified that she ultimately withdrew her request for a final PFA. Additionally, Mother testified the reason for her initial response that she was not aware of any restraining orders or PFAs against . . . Ecenrode and her belief that the temporary PFA did not matter since she chose not to pursue a final PFA order. Clearly, what is concerning to the court was Mother's testimony as to the validity of the allegations contained in Mother's and . . . Ecenrode's PFA petitions and the Child's exposure to the domestic violence that led each of them to file their PFA petitions.

The court also finds Mother's testimony to the extent of the Child's contact with . . . Ecenrode conflicting. First, Mother stated that she is still residing with him from time to time but never provided a clear answer about how often she stays there. She testified that her and the Child's belongings, as well as numerous pets, still being at . . . Ecenrode's home. It is unclear what if any of the Child's belongings remain at . . . Ecenrode's home, as well as how often the Child may be staying there. At the September 5, 2024 custody hearing, Mother testified that the Child has her own bedroom at . . . Ecenrode's home, and the Child has a close relationship with . . . Ecenrode. Second, Mother suggests the court should not have considered . . . Ecenrode as a household member since that Child no longer has contact with [him]. The custody statute defines a household member in relevant part as a person who is currently sharing a household with the child or a party. 23 Pa.C.S.A. § 5322. Considering the testimony, the court finds . . . Ecenrode is a household member and thus, is required by statute to consider him in the analysis of custody . . ..

Trial Court Opinion, 2/24/25, at unnumbered 2-4 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion or legal error by the trial court in entering its custody order. As explained above, this Court cannot make independent factual determinations and instead must accept the findings of the trial court that are supported by the evidence of record. *See* *D.Q.*, 241 A.3d at 1117. Moreover, we must defer to the trial court's credibility determinations and its assessment of the weight to be accorded to the evidence presented. *See id*.

Initially, the trial court found Mother's testimony regarding Child's living arrangements to be conflicting. Specifically, the trial court was concerned by Mother's irreconcilable testimony that, although she claimed that Child no longer has contact with Ecenrode, Mother admitted that she still occasionally resides at Ecenrode's home, has pets there, Child has a room there, and both she and Child still have belongings there.[1] *See* N.T., 12/11/24, at 5, 6, 9, 16. Mother also testified that Child stays at maternal grandmother's home "most of the time," but did not specify where else Child stays, particularly when Mother is staying at Ecenrode's home. *See* N.T., 12/11/24, at 16. Mother also testified that Child is occasionally is dropped off at Encerode's home by

---

[1] We further note that the record establishes that Mother and Ecenrode are the biological parents of a young child that they share, who is Child's younger half-sibling. *See* Trial Court Opinion, 1/3/25, at unnumbered 2. Mother also contributed $30,000 to the purchase of Ecenrode's home. *See id*.

the school bus. *See id*. at 16. Most importantly, when the trial court asked Mother whether Child is still having contact with Ecenrode, Mother stated "[y]es." *Id*. at 6. Thus, while Mother claimed that Child is no longer exposed to Ecenrode, the trial court determined that Mother's claim was lacking in credibility. Accordingly, we must defer to the trial court's credibility determinations on the living arrangements for Mother and Child.[2]

Further, although Mother insists that the trial court's custody ruling is flawed solely because the court misconstrued her living arrangements, we emphasize that the trial court considered far more than this singular consideration. Indeed, as the trial court explained, it considered each of the sixteen custody factors and each of the ten relocation factors. *See* Trial Court Opinion, 2/24/25, at unnumbered 1; *see also* Trial Court Opinion, 1/3/25, at unnumbered 6-18.

---

[2] Although Mother testified that she was in the process of purchasing a new home, the record is devoid of evidence or testimony that the transaction was ever completed. In her brief, Mother argues that she filed a motion for reconsideration of the custody order in which she claimed that the real estate transaction had been completed. Nevertheless, the fact remains that no evidence or testimony was presented to the trial court establishing that the transaction had, in fact, been completed. Thus, her argument raised for the first time in her motion for reconsideration — that the transaction had been completed — does not constitute admissible evidence or testimony, and may not be considered on appeal. *See Stange v. Janssen Pharms., Inc.*, 179 A.3d 45, 64 n.7 (Pa. Super. 2018) (holding that issue raised for the first time in motion for reconsideration to trial court was waived); *see also Prince George Center, Inc. v. United States Gypsum Co. (In re Prudential Ins. Co. of Am.)*, 704 A.2d 141, 145 (Pa. Super. 1997) (holding that issues raised initially in a motion for reconsideration are beyond the scope of appellate jurisdiction and declining to consider them on appeal).

In considering those factors, it is abundantly clear to this Court that the trial court had significant concerns regarding the Child's safety. In this regard, the trial court noted that Mother has a prior criminal conviction for disorderly conduct following an altercation with her sister. *See* Trial Court Opinion, 2/24/25, at unnumbered 2. Further, after initially denying that she and Ecenrode had ever filed PFAs against each other, Mother admitted that they had, in fact, filed PFA petitions against one another. *See* Trial Court Opinion, 1/3/25, at unnumbered 4-5. Mother further admitted to the accuracy of several of the allegations in Ecenrode's PFA petition against her, including that she pushed Ecenrode and punched him several times, she had fits of rage, she threw paint in anger, and she tried to smash the back door and break into the home. *See id*. Additionally, Mother admitted the veracity of the claims in her PFA petition against Ecenrode, including that he got in her face, threw her phone, screamed at her, body checked her, and choked her so hard during a sexual encounter that blood vessels appeared on her face and left marks on her neck. *See id*. Finally, the trial court noted that, in light of these incidents, it ordered both Mother and Ecenrode to undergo domestic violence evaluations, which Ecenode refused to do. *See id*. at unnumbered 5. While Mother submitted to such an evaluation, the trial court noted that Mother has not followed any of the evaluator's recommendations, including monitoring by her primary care physician for the reintroduction of medication for her emotional dysregulation, mental health treatment related to stress

management, anger management, and emotional regulation, domestic violence treatment and literature, couple's counseling for Mother and Ecenrode, and play therapy for the children in the home, including Child, to have an understanding of available resources to insure their safety and security should a situation arise while in Mother's home. ***See id***.

Finally, the trial court noted that a significant factor in its custody ruling was "Mother's lack of stability in terms of the Child's routine and Mother's frequent requests to change the custodial schedule based on her changing circumstances. . . . [noting] Mother['s] fail[ure] to consistently provide such stability [in the Child's home life, particularly during the school year]." Trial Court Opinion, 1/3/25, at unnumbered 18. Thus, as the trial court's factual findings are supported by the record, and we discern no abuse by the trial court in arriving at its custody ruling, we affirm the subject custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/1/2025

- 18 -